UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
BOBROW PALUMBO SALES,
INCORPORATED,

                             Plaintiff,                          CV 04-5334 (ETB)

         against-                            MEMORANDUM
                                                  OPINION AND ORDER

BROAN-NUTONE, LLC,

                             Defendant.
------------------------------------------------------------------x

      The plaintiff, Bobrow Palumbo Sales Incorporated ("Bobrow Palumbo"), commenced this action on December 8, 2004, alleging causes of action for unjust enrichment, fraud and misrepresentation, and breach of contract, with jurisdiction grounded on diversity of citizenship. Plaintiff initially sought damages in the amount of $1,113,000. On February 18, 2005, the defendant, Broan-Nutone LLC ("Broan"), filed its Answer, asserting a counterclaim for indemnification for all costs, disbursements and attorney's fees associated with this action.

      By Memorandum Decision and Order, dated January 4, 2007, the district judge assigned to this case, the Honorable Denis R. Hurley, granted Broan's motion for summary judgment dismissing the unjust enrichment cause of action, as well as the cause of action for breach of contract, to the extent that the cause of action sought commissions through December 2004. See Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC, No. 04 CV 5334, 2007 U.S. Dist. LEXIS 250, at *20 (E.D.N.Y. Jan. 4, 2007). Summary judgment was denied with respect to the breach of contract claim for the cost of the 2004 reset at issue in this action, as well as the fraud claim and Broan's counterclaim for the attorney's fees and costs of defending this action. Plaintiff

-1-

now seeks $258,000 in damages.  A bench trial was held before the undersigned on June 12 and 13, 2007.

The plaintiff seeks to enforce an alleged oral modification of the written Manufacturer's Representative Agreement, dated February 8, 1999 (the "Agreement"), consideration for which plaintiff asserts was the foregoing by it of the contractual right to terminate the contract on thirty (30) days prior written notice.  Broan denies any agreed modification, asserting that plaintiff was obligated, under the terms of the Agreement, to absorb all costs, including the cost of any merchandise setups and resets, in return for the agreed upon compensation of a three percent (3%) commission of net sales.  Plaintiff further contends that he was defrauded by Broan through false representations, which induced the plaintiff to perform the reset.

In its counterclaim, Broan seeks reimbursement for all of its expenses in connection with defending this action, including attorney's fees, pursuant to the indemnification clause of the Agreement.


FINDINGS OF FACT

I.      Introduction

Defendant Broan, whose corporate headquarters are located in Hartford, Wisconsin, manufactures a variety of household products, particularly kitchen range hoods and bath fans, with total annual sales of approximately $800 million.  (Tr. 87-88.)[1]  Broan's largest customer is Home Depot, with annual sales totaling more than $100 million.  (Tr. 88-89.)

---

[1]  References preceded by "Tr." are to pages of the transcript from the bench trial conducted on June 12 and 13, 2007.

Plaintiff Bobrow Palumbo is one of Broan's manufacturer's representatives, pursuant to the Agreement entered into by the parties in February 1999. (Tr. 4; Ex. 2.) The Agreement, which was drafted by Broan, provides for compensation to Bobrow Palumbo at a rate of three percent (3%) of Broan's net sales.[2] (Tr. 6; Ex. 2, Art. VI.) In exchange for this compensation, Bobrow Palumbo was required to perform both sales and service functions on behalf of Broan at various Home Depot locations. (Tr. 6.) Included in the Agreement was Bobrow Palumbo's obligation to perform "resets" in the stores that it serviced. (Tr. 7.) A reset consists of either replacing an old product in a store with a new product or rearranging a product currently in the store to make it more saleable. (Tr. 8.) The Agreement encompassed all Home Depot stores in the Northeast United States. (Ex. 2, at Ex. A.) Home Depot accounted for approximately ninety percent (90%) of Bobrow Palumbo's revenue generated between 1999 and 2004. (Tr. 62.) The Agreement provides that it may not be modified except "by written amendment" executed by the parties. (Ex. 2, Art. IX, § 9.3.)

Under the terms of the Agreement, either party had the ability to terminate on thirty days written notice. (Tr. 7.) Broan provided Bobrow Palumbo with such notice by letter dated August 30, 2004, with termination effective as of October 2, 2004. (Tr. 59-60, 145; Ex. 29.) Bobrow Palumbo never terminated the Agreement. (Tr. 8.)

---

[2] Testimony by Broan's Vice President of Sales, Steve Swenerton, explained that Broan's net sales are approximately twenty percent (20%) less than the gross, or invoice, price that Broan receives from Home Depot for its products. (Tr. 92.) Bobrow Palumbo's commission amounted to three percent (3%) of this net figure (i.e., the actual money Broan makes from the sale of its products, not the price it charges Home Depot to purchase them). (Tr. 93.)

II.     Testimony

     A.     William Palumbo

          The plaintiff's only witness was William Palumbo ("Palumbo"), a partner and the

Chief Executive Officer ("CEO") of Bobrow Palumbo.  (Tr. 4.)  Palumbo testified that between

1999 and 2004, Bobrow Palumbo was required to perform at least six resets on behalf of Broan,

pursuant to the Agreement.  (Tr. 8.)  Such resets are both time consuming and costly.  (Tr. 24.)

In 2004, Bobrow Palumbo was instructed to undertake a "major reset" of Broan's kitchen range

hoods on display in Home Depot stores in Bobrow Palumbo's service territory (the "2004

reset").  (Tr. 9.)  Palumbo testified that this reset was "quite extensive" in that it required

Bobrow Palumbo to "move steel, change beam heights, change beam display heights and cut

different pieces of wood."  (Tr. 10.)

          Palumbo stated that Bobrow Palumbo was made aware of this reset in 2003 and was

concerned about it due to the anticipated future implementation of a new program at Home

Depot known as the In-Store Service Initiative ("ISSI"), also referred to as the "Roadrunner"

program.  (Tr. 11.)  Under this program, Home Depot would take a direct role in hiring the

manufacturer's representatives, such as Bobrow Palumbo, rather than contracting with the

manufacturers to provide for such services.  (Tr. 11.)  Thus, under the Roadrunner program,

Home Depot would hire and compensate the manufacturer's representatives directly.  (Tr. 11.)

As of 2003, the Roadrunner program had been implemented in the electrical department,

Department 27, but was not yet in effect in the plumbing department, Department 26, where

Broan's kitchen range hoods were displayed.  (Tr. 12-13.)  Palumbo testified that he was

informed that the Roadrunner program would begin in Department 26 in 2004, at which time Bobrow Palumbo's Agreement with Broan would be terminated. (Tr. 12-13, 20.) However, since Home Depot was an integral part of Bobrow Palumbo's business, Bobrow Palumbo viewed the Roadrunner program as an opportunity to increase the amount of business that it did with Home Depot if it were selected to be employed as a manufacturer's representative directly for Home Depot under the new program. (Tr. 62-63.)

Palumbo testified that during the week of April 7, 2003, he attended a kitchen and bath show in Chicago, Illinois, where he specifically scheduled a meeting with representatives of Broan to discuss the situation concerning the 2004 reset and the Roadrunner program. (Tr. 16.) Palumbo stated that, during this show, he met with Steve Swenerton ("Swenerton"), the Vice President of Sales for Broan, Dave Pringle ("Pringle"), Broan's CEO, and Annette Mullins ("Mullins"), a regional manager for Broan, as well as her counterpart, Ray Hilding ("Hilding").[3] (Tr. 16.) According to Palumbo, he spoke with these four individuals about the 2004 reset and was informed that they would "work something out," such that Bobrow Palumbo would be additionally compensated - in excess of its contractual three percent (3%) of net sales commission - for performing the 2004 reset. (Tr. 17.) Palumbo, however, stated that he informed everyone present at that meeting that he would not commence the 2004 reset until a "payment term" was agreed upon and a "fee confirmation" was received. (Tr. 17-18.) Plaintiff offered a handwritten diary entry, dated April 8, 2003, as proof of this conversation and Palumbo identified the entry as written by him on April 8, 2003. (Tr. 64; Ex. 5.) I do not credit

_____

[3] Palumbo testified that Mullins had authority as regional manager for one-half of the United States and that Hilding had authority for the other half. (Tr. 16.)

Palumbo's testimony that he attended a trade show in Chicago on that date, nor do I credit his testimony that he informed Broan's representatives that he would not commence the 2004 reset without additional compensation. Nor do I credit the handwritten diary entry dated April 8, 2003, discussed further, _infra_, at page 13.

Palumbo further testified that following this meeting in April 2003, any time he spoke with a Broan representative, specifically Swenerton and Mullins, the conversation pertained to the additional compensation he would receive for going forward with the 2004 reset. (Tr. 20.) According to Palumbo, he spoke with Mullins on a "weekly basis" or, at the very least, every two weeks. (Tr. 21) Palumbo further testified that Broan asked him "numerous times" to provide it with a quote of what he thought it would cost Bobrow Palumbo to undertake the 2004 reset. (Tr. 20.)

By email dated October 14, 2003, Bobrow Palumbo submitted the requested quote for the services it would render in connection with the 2004 reset, which amounted to $336,000, at an estimated cost of $420 per bay. (Tr. 23, 25; Ex. 7.) This was the first time Bobrow Palumbo had ever requested additional compensation to perform a reset. (Tr. 23.) However, such compensation was necessary because the "rules of the game had changed" such that, due to the implementation of the Roadrunner program, Bobrow Palumbo would not have an opportunity to recoup in sales commissions the money it was going to be required to spend to perform the 2004 reset. (Tr. 23-24.)

Broan responded to Bobrow Palumbo's quote by email dated October 21, 2003, wherein Mullins stated the issue of the 2004 reset in connection with the Roadrunner program was being considered by Broan but that a solution had not been reached as of yet. (Tr. 26-27; Ex. 8.)

Mullins also informed Palumbo in that email that Tom Armstrong, the individual at Home Depot responsible for implementing the Roadrunner program, had estimated the cost of the reset at $350 per bay, for a total estimated cost of $280,000.[4] (Tr. 27-28.) Mullins also stated in the October 21, 2003 email that, until Broan agreed to participate in the Roadrunner program, Bobrow Palumbo's relationship with Broan was still governed by their Agreement, which specifies that resets are a function of Bobrow Palumbo's responsibilities under the Agreement and are compensated thereunder. (Tr. 29.)

According to Palumbo, both Swenerton and Mullins repeatedly instructed him to go forward with the 2004 reset and that, with respect to the compensation issue, they would "work it out." (Tr. 32.) Palumbo stated that he explained to Swenerton and Mullins that if Bobrow Palumbo commenced the reset, it would be at tremendous cost to itself, for which it expected to be compensated. (Tr. 32.) Palumbo further stated that once Bobrow Palumbo began the reset, it would be required to complete it because Home Depot was one of its biggest customers and failing to complete the 2004 reset would "be letting Home Depot down." (Tr. 32-33.)

Palumbo testified that he sent a second quote for the cost of the 2004 reset to Broan in February 2004, which amounted to $469,200. (Tr. 34; Ex. 9.) Palumbo received a response from Mullins, who informed him that his costs were too high. (Tr. 35.) According to Palumbo, Mullins instructed him that, in order for Broan to compensate him, he would have to revise his costs so that they were similar to the costs submitted by Broan's manufacturing representative for the Midwest, EA Langerfeld. (Tr. 35-36.) Mullins provided Palumbo with EA Langerfeld's

---

[4] The 2004 reset required Bobrow Palumbo to reset approximately 800 bays in the entire Northeast territory. (Tr. 27.)

pricing information, which amounted to $213,768, at an estimated cost of $334 per bay.  (Tr. 36-37; Ex. 12.)

Palumbo testified that he attended the kitchen and bath show again in March 2004 and that he again discussed the issue of additional compensation for the 2004 reset with Swenerton and Mullins.  (Tr. 39.)  Palumbo stated that he was assured that he would be compensated but that Broan was unsure of how to go about it at that time.  (Tr. 40.)  Plaintiff offered a handwritten diary entry dated March 9, 2004 to substantiate this testimony and testified that the entry was written by him some time during the week of March 9, 2004.  (Tr. 64-65; Ex. 11.)   On cross-examination, however, Palumbo was shown a letter that he sent to Ed Martin and Tom Armstrong, who Palumbo identified as "high-ranking people" within Home Depot, dated March 24, 2004, which attached a breakdown of his estimated cost of $469,200 for the 2004 reset and stated that "as of now all three companies have no intention on paying us."  (Tr. 67-68; Ex. 14.) When asked whether the information contained in this letter was true, Palumbo responded "Except for the fact that the companies had no intention of paying, yes, I believe it's true.  I was negotiating and posturing with them to get them to put some heat on [the] manufacturers."  (Tr. 68.)  When asked more specifically whether the statement that "as of now, all three companies have no intention of paying us" was true at the time he wrote it, Palumbo responded that it was indeed a true statement.  (Tr. 69.)  I do not credit Palumbo's prior direct testimony that he was advised by any Broan representative that he would be additionally compensated to perform the 2004 reset, nor do I credit the diary entries substantiating such testimony.

On March 30, 2004 Palumbo received an email from Swenerton indicating that all of Broan's management had been briefed on the compensation issue as it pertained to the 2004 reset

and that the issue should be concluded by Wednesday or Thursday of that week. (Tr. 41; Ex. 13.) Palumbo responded with an email informing Swenerton that the resets were set to begin on Thursday of that week - April 1, 2004 - and that although the first ten days of resets were scheduled, Palumbo was holding off on scheduling the remaining resets. (Tr. 42.) Palumbo testified that this statement was intended to convey that unless he received confirmation that he was going to be compensated for the 2004 reset, he had no plans of going forward with it. (Tr. 42.) I do not credit any testimony by Palumbo that, on or prior to March 30, 2004, there was an understanding between the parties that Bobrow Palumbo would be provided additional compensation for the 2004 reset.

According to Palumbo, Swenerton and Mullins informed him that in order to be compensated, Bobrow Palumbo would have to submit another quote that was "more in line with the quotes that they received from other [manufacturing representatives] around the country." (Tr. 43-44.) On April 5, 2004, Palumbo submitted the revised quote, which represented a total estimated cost of $258,000. (Tr. 47; Ex. 18.) Palumbo then sent another email to Swenerton on April 8, 2004, stating that the recovery time for Bobrow Palumbo to recoup the cost of the 2004 reset would be 19.2 weeks. (Tr. 51; Ex. 22.) Palumbo testified that the use of the word "weeks" in the email was a mistake and that it actually should have said "months." (Tr. 51.) The email also explained how the cost of $258,000 was determined by Bobrow Palumbo. (Tr. 51.)

Following the submission of the revised quote, Bobrow Palumbo commenced the 2004 reset. (Tr. 52.) According to Palumbo, its commitment to go forward with the resets was with the understanding that Bobrow Palumbo would receive the additional $258,000 compensation requested. (Tr. 52, 66.) I do not credit this testimony.

Palumbo confirmed on cross-examination that he does not have any written document from Broan reflecting this alleged agreement. (Tr. 66-67.) According to Palumbo, the agreement stems from the fact that Broan did not reject the quote of $258,000 that he submitted. (Tr. 67.)

Palumbo testified that the 2004 reset began on April 1, 2004. (Tr. 34, 84.) On redirect examination, however, he testified that the reset began on April 8, 2004.[5] (Tr. 84.) When he was recalled to testify prior to the close of the trial, Palumbo reaffirmed that the reset commenced on April 8, 2004, which was the Thursday before Easter, although it was scheduled to begin on April 1, 2004. (Tr. 222.) According to Palumbo, he postponed commencing the reset until he was guaranteed additional compensation for performing it. (Tr. 223.) On cross-examination, Palumbo was again shown the email that he sent to Swenerton, dated March 30, 2004, which states that the reset was to begin on Thursday of that week. (Tr. 225; Ex. 17.) After consulting a calendar, Palumbo testified that March 30, 2004 was a Tuesday that year and that Thursday of that week was April 1, 2004. (Tr. 225.) Palumbo confirmed that as of March 30, 2004, the reset was scheduled to commence on April 1, 2004. (Tr. 226.) Palumbo testified that he postponed commencing the reset, however, when he did not get a favorable response from Broan concerning his request for additional compensation. (Tr. 226.) Palumbo further testified that he received a guarantee that he would receive additional compensation from Swenerton at the April 2004 kitchen and bath show - approximately April 4, 2004 - and that, following receipt of that guarantee, he began the 2004 reset. (Tr. 226-27.) I do not credit this testimony of guaranteed

_____

[5] On re-cross examination, Palumbo stated that he was surprised to learn that April 8, 2004 was the second Thursday in April that year and not the first. (Tr. 84.)

payment by Swenerton, discussed _infra_.

On May 19, 2004, approximately one month after the 2004 reset began, Palumbo received an email from Swenerton attaching what appears to be a form letter sent to all of Broan's manufacturer's representatives, dated May 20, 2004, which stated that none of the manufacturer's representatives would be paid any additional compensation for the 2004 reset. (Tr. 54, 58; Ex. 25.) Palumbo responded via email on May 19, 2007, stating that he felt that he was misled by Broan. (Tr. 55.)

On August 30, 2007, Palumbo received a discharge notice from Broan informing him that the Agreement between Broan and Bobrow Palumbo was being terminated, effective October 2, 2004. (Tr. 59-60.) Bobrow Palumbo was fully compensated for all services rendered through September 2004 but was not paid any additional compensation for the 2004 reset. (Tr. 60.)

B.    Steve Swenerton

Steve Swenerton, who has been the Vice President of Sales for Broan for the past fourteen years, testified that during the period 2002 through 2004, Broan employed five manufacturer's representatives in connection with its business at Home Depot, including Bobrow Palumbo. (Tr. 86, 94.) The manufacturer's representatives' territories were divided up geographically and each representative maintained exclusive responsibility for the territory to which it was assigned. (Tr. 94.) Bobrow Palumbo's territory encompassed the entire Northeast United States. (Tr. 94.) All of the manufacturer's representatives' contracts with Broan were identical to the Agreement between Broan and Bobrow Palumbo and each of the representatives' contracts specified a compensation rate of three percent (3%) of net sales. (Tr. 95.)

Swenerton testified that Broan expected its manufacturer's representatives to perform

-11-

three "essential functions." (Tr. 96.) The first was to "set new stores," which included placing Broan's products within a new store and ensuring they were ready to be sold when the store opened. (Tr. 96.) The second function the representatives were expected to perform was "in-store service." (Tr. 96.) This encompassed "a number of important functions," including "[e]nsuring that surplus inventory on top is brought down so it's accessible for consumers to purchase," training store employees, ensuring that display products are in a saleable condition and processing returns. (Tr. 96-97.) The final function was to perform resets. (Tr. 97.) With respect to resets, Swenerton testified that they were "very periodic" and that "generally speaking," resets were initiated by Home Depot. (Tr. 98.) Swenerton further testified that between 1999 and 2004, there were three major resets conducted at Home Depot stores, including a kitchen range hood reset in 1999, a bath fan reset in 2003 and the 2004 kitchen range hood reset at issue in the within action. (Tr. 98.)

Swenerton testified that all three of the functions performed under the Agreement were compensated by payment of a commission of three percent (3%) of net sales, as specified in the contracts. (Tr. 99.) There was no separate understanding that the representatives would be paid more during a reset or less when a reset was not occurring. (Tr. 99-100.) Swenerton further testified that, prior to the 2004 reset, none of Broan's manufacturer's representatives had ever requested additional compensation to perform a reset and none had ever been paid any additional compensation. (Tr. 100.)

With respect to the Roadrunner program, Swenerton testified that Broan received a letter in June 2003 from Jerry Edwards, the Executive Vice President of Merchandising for Home Depot, which stated that Home Depot was "planning approval of a concept pilot of an in-store

service model" that they planned to initiate during the latter part of 2003 with the electrical

department, Department 27. (Tr. 102; Ex. 6.) Although Broan did not have any products in that

department, it did have products in Department 26 - specifically, its kitchen range hoods. (Tr.

102.) Swenerton testified that it was understood within Broan that if the Roadrunner program

were to be implemented in Department 26, the manufacturer's representatives would no longer

be hired, managed or compensated by Broan but rather, those that were appointed once the

program was put in place would be employed by Home Depot instead. (Tr. 103-04.) Swenerton

further testified that this was not a development that Broan was particularly happy with, however

participation in the Roadrunner program was mandatory. (Tr. 103-04.)

In contrast to the testimony provided by Palumbo, Swenerton testified that the April 2003

kitchen and bath show was not held in Chicago, Illinois but rather in Orlando, Florida. (Tr. 106-

07.) In addition, Swenerton testified that the kitchen and bath show did not take place on April

8, 2003, as proffered by plaintiff but instead was held from April 11-13, 2003. (Tr. 107, 109; Ex.

39.) I credit this testimony. Swenerton himself did not arrive in Florida for the kitchen and bath

show until April 9, 2003. (Tr. 110; Ex. 39.) Swenerton testified that as a result, he could not,

and did not, have any conversation with Palumbo on April 8, 2003 in which Swenerton agreed to

pay Bobrow Palumbo additional compensation to complete the 2004 reset. (Tr. 110.) I credit

this testimony as well. Swenerton further stated that Broan did not even learn of the requirement

to perform the 2004 reset from Home Depot until July 17, 2003, subsequent to the April 2003

kitchen and bath show. (Tr. 110-11.) I credit this testimony.

With respect to the 2004 reset, Swenerton testified that an agreement concerning the reset

was not finalized with Home Depot until October 7, 2003, at a meeting held in Atlanta. (Tr.

111.) Swenerton characterized the 2004 reset as a "major reset" that required a significant amount of work to be performed. (Tr. 165.) The 2004 reset was solely Home Depot's idea and Broan did not agree with it because Broan did not have any new products to showcase at the time. (Tr. 111-12.) Accordingly, Broan felt that the 2004 reset, which was going to require a significant expenditure of money, was an unnecessary expense that was not going to necessarily increase Broan's sales at Home Depot. (Tr. 112.) Swenerton testified that although the manufacturer's representatives would incur the cost of the labor to implement the reset, Broan would be responsible for the cost of the product as well as the display cabinets, merchandising signage and the freight cost for shipping everything to Home Depot. (Tr. 112-13.) In total, Broan spent approximately one million dollars on the 2004 reset at an average cost of $600 per Home Depot store. (Tr. 113.) Although Broan shared its concerns with Karin Klein, its buyer at Home Depot, it was informed that the 2004 reset was mandatory. (Tr. 113.)

Swenerton testified that on October 14, 2003, he received an email from Palumbo requesting additional compensation to perform the 2004 reset. (Tr. 114; Ex. 7.) This was the first written request that Swenerton received from Palumbo regarding additional compensation.[6] (Tr. 114.) Swenerton testified that his reaction to Palumbo's request was "surprise" because Broan had never experienced such a request, either from Palumbo or any other manufacturer's representative. (Tr. 115.) Notwithstanding the lack of any prior requests, Swenerton testified that Broan was willing to consider Palumbo's request for additional compensation. (Tr. 115-16.) However, he stated that, in order to do so, Broan needed to understand the financial justification

---

[6] Any decision to provide Bobrow Palumbo with additional compensation was to be made by Swenerton as Vice President of Sales for Broan. (Tr. 114-5.)

for it.  (Tr. 116.)  In addition, Broan was unsure at this point - October 2003 - when the

Roadrunner program was going to be implemented in Department 26.[7]  (Tr. 116.)

Swenerton testified that following Palumbo's initial request for additional compensation

in October 2003, the issue next arose in February 2004 when he received a second quote from

Palumbo.  (Tr. 117.)  Swenerton testified that he did not engage in weekly or continuous

discussions with Palumbo concerning this issue between October 2003 and February 2004, as

testified by Palumbo.  (Tr. 117.)  The second quote submitted by Bobrow Palumbo was for

$469,200.  (Tr. 118; Ex. 9.)  Swenerton testified that this figure seemed "awfully high."  (Tr.

118.)  In addition, certain financial information that Broan was interested in reviewing in

connection with Palumbo's request was absent from the second quote - specifically, the amount

of money being spent on in-store service as well as the new store sets and the accrual that was

being made for reset activity.  (Tr. 118.)  On cross-examination, Swenerton testified that any

subsequent conversations with Palumbo with respect to the request for additional compensation

were for the purpose of informing Palumbo that he needed to provide financial justification to

support his request and not in an effort to persuade Palumbo to reduce his estimated cost of the

2004 reset.  (Tr. 154.)  I credit this testimony.

When Swenerton received Bobrow Palumbo's second quote in February 2004, Broan was

aware that implementation of the Roadrunner program in Department 26 would begin in either

the fourth quarter of 2004 or the first quarter of 2005.  (Tr. 119.)  Broan was also aware that

Home Depot's expectation was that the 2004 reset would cost approximately $350 per bay.  (Tr.

---

[7] On cross-examination, Swenerton testified that Broan learned that Department 26
would take part in the Roadrunner program during a conversation with Tom Armstrong of Home
Depot on October 7, 2003.  (Tr. 153.)

119.)  Additionally, although Home Depot had not specified which manufacturer's representative would be chosen to participate in the Roadrunner program in Department 26, it did indicate to Broan that Bobrow Palumbo was in a "very favorable position" to be appointed as the Department 26 "go-forward rep."[8]  (Tr. 119-20.)

Swenerton testified that one other manufacturer's representative, EA Langerfeld, requested additional compensation in connection with the 2004 reset.  (Tr. 120-21.)  Swenerton further testified that when the estimated costs of performing the 2004 reset submitted by both EA Langerfeld and Bobrow Palumbo were compared, Bobrow Palumbo's costs were significantly higher.  (Tr. 122; Ex. 12.)  Specifically, EA Langerfeld estimated their cost of completing the 2004 reset at $334 per bay, while Bobrow Palumbo's estimated cost was $552 per bay.  (Tr. 122; Ex. 12.)  In addition, Home Depot had estimated the cost at $350 per bay.  (Tr. 122.)  According to Swenerton, the cost per bay was the most important factor to Broan when considering whether to provide additional compensation for the 2004 reset.  (Tr. 122.)

Swenerton testified that he received an email from Palumbo, dated March 30, 2004, in which Palumbo stated that the resets in the Northeast would begin on Thursday of that week, which was April 1, 2004.  (Tr. 124-25; Ex. 13.)  The email also asked if there was "[a]ny word on payment terms."  (Tr. 124.)  Swenerton testified that he responded to Palumbo's email, stating that the situation had been reviewed with Broan's financial management the day before and that they would be meeting with respect to the compensation issue again that day.  (Tr. 124.)  Swenerton further responded that the issue should be able to be concluded by Wednesday or

---

[8]  As matters turned out, Bobrow Palumbo was not chosen as the manufacturer's representative by Home Depot for Department 26, but was chosen for another department.

Thursday of that week.  (Tr. 124.)  According to Swenerton, Broan's financial management had "essentially agreed" with Swenerton's position that, in the absence of a complete financial justification for additional compensation, such a request could not be honored.  (Tr. 125.)

Swenerton testified that he subsequently had a conversation with Palumbo about the lack of financial justification provided to support the request for additional compensation at the kitchen and bath show that took place in Chicago, Illinois on April 2-4, 2004.  (Tr. 125.) Swenerton stated that Broan needed to have an understanding of what Bobrow Palumbo was "accruing for new store sets and for resets and what his normal in-store service costs were to service the stores for [Broan's] account" in order to justify the additional compensation that Bobrow Palumbo was requesting.  (Tr. 128.)  On April 5, 2004, Broan received a third quote from Bobrow Palumbo for its estimated cost of performing the 2004 reset, this time for $258,000.  (Tr. 129; Ex. 18.)  Swenerton testified that he felt that this cost was "reasonable" and that he communicated this to Palumbo  (Tr. 129, 151, 182.)

In addition to providing the revised quote, Palumbo also submitted information regarding how much of his monthly commission was being allocated for in-store service costs.  (Tr. 129; Ex. 18.)  Palumbo estimated his monthly commission at $71,000 per month, which Swenerton testified was correct.  (Tr. 129; Ex. 18.)  However, Palumbo also estimated his in-store service costs as $296,000 for a four-month period, which computes to approximately $74,000 per month. (Tr. 129-30.)  Swenerton testified that such a figure did not make sense to him because it meant that Bobrow Palumbo was spending more money than it was making each month on only one of the three functions for which it was paid to perform under the Agreement.  (Tr. 130-31.)  This, in effect, meant that Bobrow Palumbo was running its business at a loss each month.  (Tr. 130-31.)

Swenerton testified that he communicated to Palumbo that his estimate for in-store service costs "simply wasn't credible." (Tr. 182.) Palumbo also indicated in his revised quote that the total "recovery time" for the cost of the 2004 reset would be approximately eight months. (Tr. 131; Ex. 18.) According to Swenerton, if Bobrow Palumbo was losing more than $3,000 per month on the in-store service alone, it would be impossible for it to ever recover the cost of the 2004 reset under its Agreement with Broan. (Tr. 131.) Rather, if Palumbo's estimates were correct, Bobrow Palumbo would be putting itself further into debt each month regardless of the cost of the 2004 reset. (Tr. 131.) Such information did not make sense to Swenerton. (Tr. 131.)

On April 8, 2004, Palumbo sent another email to Swenerton, indicating that the previous recovery time estimate of eight months was wrong and that the revised estimate was 19.2 weeks. (Tr. 131; Ex. 22.) When asked about Palumbo's testimony that he advised Swenerton that the "19.2 weeks" should have actually stated "19.2 months," Swenerton testified that such a conversation never took place. (Tr. 131-32.) I credit Swenerton's version.

Swenerton testified that, at some point, he had a discussion with Palumbo in which he advised Palumbo that if Home Depot were to choose to implement the Roadrunner program in the first quarter of 2005, Broan would pay him his standard commission under the Agreement through the end of 2004 (i.e., three percent (3%) of net sales). (Tr. 133.) Swenerton stated that he did not commit to any such arrangement, however, because Broan was still uncertain as to the actual timing for implementation of the Roadrunner program in Department 26. (Tr. 133.) Swnererton testified that he did not tell Palumbo that Broan would provide him with the requested $258,000 in additional compensation. (Tr. 133.) I credit this testimony.

On May 5, 2004, Swenerton learned from Karin Klein and Tom Armstrong of Home

Depot that Home Depot intended to implement the Roadrunner program in Department 26 in October 2004. (Tr. 134; Ex. 24.) Swenerton testified that, as a result, Broan would be unable to continue its Agreement with Bobrow Palumbo after October 2004. (Tr. 134-35.) Under the proposed plan by Home Depot, the manufacturer's representatives would continue to work for Broan through September 2005 but then Home Depot would take over the in-store service function from that point on and Broan would pay Home Depot directly. (Tr. 135.)

Under the Roadrunner program, Broan would pay a percentage of the cost of its goods each month to Home Depot for new store sets and in-store service only. (Tr. 135-36.) This fee would not apply to resets but rather Broan would have to pay for resets separately, in addition to the percentage it would already be paying to Home Depot. (Tr. 136.) As a result, Swenerton testified, Broan believed that the percentage it would be paying to Home Depot would be less than the three percent (3%) commission they were currently paying to their manufacturer's representatives. (Tr. 136.) However, as of this time - May 2004 - Broan was unaware of what percentage Home Depot actually planned to charge. (Tr. 137.)

After receiving the information that the Roadrunner program would commence in Department 26 in October 2004, Broan decided to offer to pay the manufacturer's representatives the difference between whatever percentage was negotiated with Home Depot for their fee and the standard three percent (3%) commission the representatives were receiving through the end of 2004, provided the representatives were chosen by Home Depot as the "go-forward rep." (Tr. 137-38.) A letter detailing Broan's plan was sent to each of the manufacturer's representatives, including Bobrow Palumbo, on May 20, 2004. (Tr. 139; Ex. 26.)

On August 17-18, 2004, representatives from Broan, including Swenerton, met with

Karin Klein and Tom Armstrong of Home Depot in Atlanta, Georgia to discuss the percentage that Broan would pay to Home Depot for new store sets and in-store service.  (Tr. 142-43.)  At this meeting, Home Depot indicated they were seeking a fee of four percent (4%) of gross sales for these services.  (Tr. 143-44.)  Swenerton testified that Broan was "stunned" by this expectation and that, after a "very difficult negotiation," was able to reach an agreement with Home Depot for a fee of three percent (3%) of gross sales, which was greater than the three percent (3%) of net sales Broan was currently paying to its manufacturer's representatives to perform all three functions.[9]  (Tr. 144.)  In addition, as stated earlier, Broan would have to pay separately for any resets to be performed in the future.  (Tr. 145.)  Swenerton testified that Broan agreed to the arrangement with Home Depot because it did not have any other choice.  (Tr. 145.)

By letter dated August 30, 2004, Swenerton notified Palumbo that Broan's agency relationship with Bobrow Palumbo would terminate effective October 2, 2004.  (Tr. 145; Ex. 29.)  Swenerton testified that all of Broan's manufacturer's representatives were terminated at this time due to the implementation of the Roadrunner program at Home Depot.  (Tr. 145.)  Swenerton further testified that, had it been Broan's decision, it would have maintained its relationship with Bobrow Palumbo.  (Tr. 145-46.)  Swenerton also testified that if it had been given the option, Broan would not have performed the 2004 reset and stated that Broan lost money on both the Roadrunner program and the 2004 reset.[10]  (Tr. 146.)

_____

[9]  Swenerton testified that three percent (3%) of gross sales equated to 3.75% of net sales, which he characterized as "substantially greater."  (Tr. 144.)

[10]  Swenerton testified that although Broan had an increase in sales of its kitchen range hoods in 2004, such sales declined in both 2005 and 2006.  (Tr. 146; Ex. 35.)  Accordingly, the 2004 reset did not increase sales as Home Depot had anticipated.  (Tr. 146.)

With respect to Bobrow Palumbo's compensation, Swenerton testified that Bobrow Palumbo was paid its standard commission, as per its Agreement with Broan, after April 1, 2004, when the 2004 reset commenced, through the effective termination date, October 2, 2004, totaling approximately $400,000. (Tr. 147; Ex. 37.) Swenerton further testified that between October 2003 and October 2, 2004, Broan paid Bobrow Palumbo more than $850,000. (Tr. 147; Ex. 37.) Bobrow Palumbo was not ultimately chosen by Home Depot to be the "go-forward rep" in Department 26, which Broan was apprised of in July or August 2004. (Tr. 168.) Bobrow Palumbo completed the 2004 reset to Broan's satisfaction in July 2004. (Tr. 168-69.) Bobrow Palumbo was not paid any additional compensation for the cost of the 2004 reset. (Tr. 180.)

C.    Annette Mullins

Annette Mullins, a National Account Manager for Broan in 2003 and 2004, testified that she shared her position with Ray Hilding, with their responsibilities being divided up by territory. (Tr. 185.) Bobrow Palumbo's region of service was included in Mullins' territory. (Tr. 185.) As a National Account Manager, Mullins reported to Swenerton. (Tr. 185.)

With respect to the inclusion of Department 26 in the Roadrunner program, Mullins testified that Broan became aware of the specifics, including the 2004 reset, at a meeting with Tom Armstrong of Home Depot on October 7, 2003. (Tr. 193.) Mullins testified that Broan also became aware at that time that its participation in the Roadrunner program was mandatory. (Tr. 193.) Mullins testified that Broan learned of the percentage Home Depot was planning to charge them under the Roadrunner program at a meeting held on August 18, 2004. (Tr. 193-94.) Mullins did not attend this meeting but rather learned of the results of it upon Swenerton's return from the meeting. (Tr. 193-94.) Mullins stated that prior to this date, Broan did not know how

-21-

much Home Depot was planning to charge its vendors under the Roadrunner program. (Tr. 194.)

Mullins testified that she contacted each of her manufacturer's representatives following the October 7, 2003 meeting with Home Depot and informed them of the requirement to perform the 2004 reset. (Tr. 197.) Palumbo expressed some concern to Mullins about the cost of the reset and Mullins testified that she advised him that his Agreement with Broan specifies that resets are part of his contractual duties and are compensated as part of his three percent (3%) commission. (Tr. 189, 197.) I credit this testimony. Palumbo stated to her at that time that he would like additional compensation to perform the 2004 reset. (Tr. 186.) Mullins directed Palumbo to substantiate his request and that, after doing so, she would be willing to present it to her management, specifically Swenerton. (Tr. 186, 197.) Mullins further testified that she did not have the authority to amend or modify a written contract between Broan and one of it's manufacturer's representatives and that only Swenerton possessed that authority. (Tr. 186.) Mullins stated that Palumbo knew that she did not possess the authority to modify a written contract due to his familiarity with Broan and its chain of command and that she neither communicated or intimated to Palumbo that she possessed such authority. (Tr. 187.) I credit this testimony. Moreover, Mullins never advised Palumbo that Broan would provide him with additional compensation to perform the 2004 reset. (Tr. 187-88.) I credit this testimony.

Mullins testified that the 2004 reset was a required task under the Agreement between Bobrow Palumbo and Broan, for which Bobrow Palumbo was compensated according to the standard three percent (3%) of net sales commission specified in the Agreement. (Tr. 187.) Mullins further testified that Palumbo never informed her that if Broan did not pay him additional compensation to perform the 2004 reset, he would terminate the Agreement and refuse

to complete the reset.[11]  (Tr. 188.)  Nor did Palumbo ever send Mullins a thirty-day notice of termination of the Agreement.  (Tr. 188.)  I credit this testimony.

Palumbo thereafter sent Mullins an email, dated October 14, 2003, which contained his initial quote concerning the estimated cost of the 2004 reset.  (Tr. 196-97; Ex. 7.)  Mullins testified that this email was Palumbo's attempt to substantiate his request and that she passed the email along to Swenerton.  (Tr. 197.)

Mullins testified that Palumbo provided a second quote concerning the cost of the 2004 reset in February 2004.  (Tr. 198.)  Mullins did not request this information from Palumbo.  (Tr. 198.)  Mullins further testified that she spoke to Palumbo quite frequently between the time he submitted his first quote - October 2003 - and the submission of his second quote - February 2004 - and that whenever Palumbo raised the issue of additional compensation during those conversations, she advised him that resets were governed under his Agreement with Broan but that if he wanted to substantiate his costs any further, she would provide such information to her management.  (Tr. 198-200.)  I credit this testimony.  Palumbo thereafter provided his second quote on February 4, 2004.  (Tr. 201; Ex. 9.)  As with the first quote, Mullins relayed the information to Swenerton.  (Tr. 201.)  Mullins testified that Swenerton found the second quote to be "very unreasonable" and indicated that he would respond to Palumbo directly.  (Tr. 201-02.)

---

[11]  On cross-examination, Mullins agreed that Palumbo stated to her that he did not think that he could afford to perform the 2004 reset but reiterated that he never indicated that he would not perform the reset as required.  (Tr. 188.)  Had Palumbo refused to perform the 2004 reset or terminated the Agreement with Broan, Mullins testified that Broan was prepared to make other arrangements to have the reset completed.  (Tr. 190.)  Mullins further testified that these arrangements were not specific to Palumbo but rather, had any manufacturer's representative terminated its contract during any process, Broan would be prepared for such a situation.  (Tr. 191.)  I credit this testimony.

Mullins further testified that she never instructed Palumbo to reduce the cost estimates that he was providing to Broan. (Tr. 202-03.)

With respect to the email dated March 9, 2004, which compares the cost estimates of both Bobrow Palumbo and EA Langerfeld (Ex. 12), Mullins testified that she provided this information to Palumbo. (Tr. 206, 211.) However, Mullins testified that she did not instruct Palumbo to reduce his costs based on the information submitted by EA Langerfeld. (Tr. 206, 211.) Rather, Mullins testified that she requested input from Palumbo regarding certain questions Swenerton had requested she ask of Palumbo. (Tr. 206.)

Mullins testified that Palumbo never advised her that once he started performing the 2004 reset, he would be unable to stop. (Tr. 206.) Nor did Palumbo advise Mullins that if he started the 2004 reset and stopped performing it prior to completion that it would "look bad" to Home Depot. (Tr. 206-07.) I credit this testimony.

With respect to the kitchen and bath show in April 2004, Mullins testified that she was present and that she, Swenerton and Palumbo had a conversation about Palumbo's request for additional compensation to perform the 2004 reset. (Tr. 207-08.) Thereafter, Palumbo provided his revised quote of $258,000. (Tr. 209.) Mullins testified that she did not request this information from Palumbo but that Swenerton may have. (Tr. 209.) Mullins noted that the cost estimate of $258,000 was less than the prior quotes submitted by Palumbo. (Tr. 209.) Mullins further testified that Swenerton communicated to her that Palumbo's third quote of $258,000 "seemed reasonable" but that "there were two other elements as part of the information [Broan was] requesting from [Palumbo] . . . [a]nd they were not reasonable." (Tr. 210.)

Mullins testified that she did not specifically instruct Palumbo to commence the 2004

reset but assumed that he would do so since he was contractually required to perform it.  (Tr. 210.)  Mullins testified that she never advised Palumbo that she would assist him in receiving additional compensation for the 2004 reset.  (Tr. 211.)

        D.     <u>Patrick Perrone</u>

        Patrick Perrone ("Perrone"), an attorney with the law firm McCarter & English, who represents the defendant Broan in the within action, testified on behalf of Broan with respect to its counterclaim for attorney's fees.  Exhibit 38, which is a summary and billing detail of the services McCarter & English has provided to Broan in connection with this litigation, was admitted into evidence as part of Perrone's testimony.  (Tr. 217; Ex. 38.)

        Perrone testified that there were two partners who performed work on behalf of Broan in this action, himself and an individual named Joseph DeSalvo ("DeSalvo").  (Tr. 218.)  Perrone's billing rate is $375 per hour and DeSalvo's billing rate is $295 per hour.  (Tr. 218.)  Perrone also testified that there were two associates who participated in this litigation, Nolan Shanahan and Loly Tor, whose billing rates are $265 per hour and $225 per hour, respectively.  (Tr. 218-19.)  Perrone further testified that additional work was performed in this action by paralegals, whose billing rates are $125 per hour and $130 per hour.  (Tr. 219.)  Perrone confirmed that all of the bills rendered to Broan by McCarter & English in connection with this action have been paid in full by Broan.  (Tr. 219.)

<u>CONCLUSIONS OF LAW</u>

I.     <u>Choice of Law</u>

        Federal courts sitting in diversity apply the choice of law rules of the forum state, which,

-25-

in this action, is New York, when determining the law that governs a contract.  See Fin. One

Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005), cert. denied,

126 S. Ct. 2968 (2006); Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d

Cir. 1984); Live Nation Worldwide, Inc. v. GTA, Inc., No. 07-CV-483, 2007 U.S. Dist. LEXIS

37375, at *9 (S.D.N.Y. May 18, 2007).  Under New York law, contractual choice of law

provisions are generally enforced unless "the most significant contacts with the matter in dispute

are in another state."  Walter E. Heller & Co., 730 F.2d at 52; see also Live Nation, 2007 U.S.

Dist. LEXIS 37375, at *10 ("New York courts enforce choice of law provisions in contracts.")

(citations omitted).  Here, the Agreement provides that it "shall be construed according to the

laws of the State of Wisconsin," (Ex. 2, Art. IX, ¶ 9.6), and both parties agree that Wisconsin

law should govern the resolution of this dispute.


II.      Breach of Contract

        A.      Legal Standard for Oral Modification of a Written Contract

                Under Wisconsin law, a written contract may be modified orally by the parties,

notwithstanding the presence of a clause prohibiting oral modification.  See Royster-Clark, Inc.

v. Olsen's Mill, Inc., 714 N.W.2d 530, 536 n.9 (Wis. 2006); see also Allen & O'Hara, Inc. v.

Barrett Wrecking, Inc., 898 F.2d 512, 518 (7th Cir. 1990) (citing S&M Rotogravure Serv. Inc. v.

Baer, 252 N.W.2d 913, 919 (Wis. 1977) (additional citation omitted).  To determine whether an

oral modification to a contract has occurred, Wisconsin courts employ a two-prong test: (1)

whether the parties agreed to waive the no oral modifications clause in the contract, and (2)

whether the parties reached an agreement to modify the underlying contract.  See Allen &

-26-

O'Hara, 898 F.2d at 518; Royster-Clark, 714 N.W.2d at 536 n.11 (citation omitted).

The parties dispute the burden of proof to be applied when determining whether an agreement has been orally modified.  While both parties agree that Wisconsin courts are silent on the applicable burden of proof, plaintiff contends that only a preponderance of evidence is required, (Pl. Post-Trial Mem. of Law, 10), while defendant maintains that an oral modification must be demonstrated by clear and convincing evidence.  (Def. Proposed Findings of Fact and Conclusions of Law (hereinafter "Def. Proposed Findings"), 18, ¶ 6.)  In support of its argument, plaintiff asserts that this court should follow the law of New York on this issue, (Pl. Post-Trial Mem. of Law, 10-11) and cites to one case from the Supreme Court of New York, Appellate Division, Third Department, Alcon v. Kinton Realty, Inc., 156 N.Y.S.2d 439, 440 (3d Dep't 1956), in which the court stated that "[t]he evidence which the trier of the facts was entitled to, and did, find both credible and preponderant adequately supports the determination that an oral agreement modifying plaintiff's lease was made and acted upon . . . ."  Conversely, as defendant correctly asserts, a majority of other jurisdictions to consider this issue have required the party alleging the modification to prove such modification by clear and convincing evidence.[12]  (Def. Proposed Findings, 18, ¶ 6) (citing cases).  While the Court is inclined to agree with the majority

_____

[12] See, e.g., MDNet, Inc. v. Pharmacia Corp., 147 Fed. Appx. 239, 243-44 (3d Cir. 2005) (applying Pennsylvania law and stating that "[a]n oral waiver or modification of a written contract must be proved by clear, precise and convincing evidence"); Diomed, Inc. v. Vascular Solutions, Inc., 417 F. Supp. 2d 137, 142 (D. Mass 2006) (stating that Minnesota law "require[s] that subsequent oral modifications of a written agreement be shown by clear and convincing evidence"); Powers v. Miller, 984 P.2d 177, 180 (N.M. App. 1999) ("We find support for our decision in cases from other jurisdictions that require that a subsequent oral modification of a written contract be proven by clear and convincing evidence.") (citing cases from Arkansas, Idaho, Illinois, Kentucky, Minnesota, Montana, North Carolina, Oregon, Pennsylvania and West Virginia).

rule that an oral modification of a written agreement must be established by clear and convincing evidence, the Court finds that, regardless of which burden of proof is applied, plaintiff has failed to adequately demonstrate by credible evidence, under either standard, that an oral modification to the Agreement at issue herein occurred, as further discussed below.

        B.      <u>Plaintiff has Failed to Prove that Broan Waived the No Oral Modification Clause</u>

        In order to establish an oral modification of the Agreement, plaintiff must first demonstrate that Broan waived the provision of the Agreement prohibiting oral modifications. <u>See</u> <u>Allen & O'Hara</u>, 898 F.2d at 518; <u>see</u> <u>also</u> <u>S&M Rotogravure Serv.</u>, 252 N.W.2d at 920 (stating that a contract "requiring written change orders could be avoided where the parties evidence by their words or conduct an intent to waive or modify such a provision"). Wisconsin law defines waiver as "'the voluntary and intentional relinquishment of a known right.'" <u>Sperry Mktg., Inc. v. Swing 'N Slide Corp.</u>, No. 96-2155, 1997 WL 94256, at *5 (D. Kan. Feb. 13, 1997) (applying Wisconsin law) (quoting <u>Hanz Trucking, Inc. v. Harris Bros. Co.</u>, 138 N.W.2d 238, 244 (Wis. 1965)) (additional citation omitted). "'Intent to waive is an essential element of waiver.'" <u>Sperry Mktg.</u>, 1997 WL 92456, at *5 (quoting <u>Nelson v. Caddo-Texas Oil Lands Co.</u>, 186 N.W. 155, 156 (Wis. 1922)).

        Plaintiff asserts that it has proven that Broan waived the no oral modification clause in the Agreement because Bobrow Palumbo did not agree to commence the 2004 reset until Broan agreed to provide additional compensation in exchange for the reset being performed. (Pl. Post-Trial Mem. of Law, 11-13.) Plaintiff relies on Swenerton's statement that Bobrow Palumbo's third quote with respect to the estimated cost of the 2004 reset in the amount of $258,000 was "reasonable" as proof that Broan planned to compensate Bobrow Palumbo in exchange for the

2004 reset being performed and, therefore, as proof of Broan's intent to modify the Agreement. (Id.)  I do not agree with plaintiff's assertions.

Both Swenerton and Mullins testified that they never agreed to provide Bobrow Palumbo with additional compensation in exchange for the 2004 reset.  Rather, Broan was willing to consider such a request, provided Bobrow Palumbo could financially justify the need for it. However, after examining Bobrow Palumbo's estimated costs in comparison to the monthly commission that it received from Broan, Broan did not feel that such compensation was justified. Moreover, Bobrow Palumbo was already contractually required to perform the 2004 reset, regardless of any additional compensation, under the Agreement in place between the parties.

Palumbo testified that he discussed his concerns regarding the cost of the 2004 reset with representatives of Broan, including both Swenerton and Mullins, during a kitchen and bath show in Chicago, Illinois on April 8, 2003.  (Tr. 16, 64.)  According to Palumbo, the representatives of Broan indicated that Bobrow Palumbo would receive some form of additional compensation to perform the 2004 reset.  (Tr. 17.)  Palumbo also testified that he informed everyone present at the meeting that he would not perform the 2004 reset unless he was additionally compensated.  (Tr. 17-18.)  Following this meeting, Bobrow Palumbo submitted numerous quotes to Broan estimating the cost of completion of the 2004 reset.  (Ex. 7, 9, 18.)  Palumbo submits that throughout this process, he was repeatedly informed by Swenerton and Mullins that Broan would "work something out" with respect to additional compensation.  (Tr. 17, 32, 40.)

This testimony was directly contradicted by both Swenerton and Mullins.  I credit the latters' testimony, as stated above.  First, Swenerton testified that the 2003 kitchen and bath show was not held in Chicago, Illinois on April 8, 2003 but rather in Orlando, Florida from April

11-13, 2003 and Swenerton himself did not arrive in Florida until April 9, 2003.  (Tr. 106-07, 110.)  Broan submitted documents that substantiate this testimony.  (Ex. 39.)  Accordingly, as Swenerton testified, and I credit, Palumbo could not have had a conversation with representatives from Broan - and more specifically, Swenerton - concerning additional compensation for the 2004 reset on April 8, 2003, as set forth in Palumbo's diary.  Second, contrary to Palumbo's testimony, Mullins testified that Palumbo never informed her that Bobrow Palumbo would refuse to perform the 2004 reset unless it was provided additional compensation.  (Tr. 188.)  Finally, although Swenerton and Mullins testified that Broan was willing to consider Bobrow Palumbo's request for additional compensation, both individuals testified that they never advised Palumbo that he would in fact receive additional compensation from Broan as such compensation was found to be financially unjustified.  (Tr. 110, 125, 129-31, 138-39, 187-88.)  Plaintiff did not offer any documents or credible evidence to contradict this testimony.

Based on the foregoing, I find that plaintiff has failed to establish even by a preponderance of the credible evidence that Broan intended to, and did in fact, waive the prohibition against oral modifications in the Agreement put in place between the parties.

C.     Plaintiff has Failed to Prove that the Parties Agreed to the Alleged Modification

The second element that plaintiff must demonstrate to establish an oral modification of a written agreement is that both parties agreed to modify the underlying contract and that they agreed to the terms of the modification.  See Allen & O'Hara, 898 F.2d at 518. Plaintiff has failed to make any such showing by a preponderance of the credible evidence.

Plaintiff again asserts that the quotes it submitted to Broan and Swenerton's statement that the final quote of $258,000 was "reasonable" are proof that the parties agreed to modify

their Agreement, such that plaintiff would receive additional compensation to perform the 2004 reset. (Pl. Post-Trial Mem. of Law, 13.) However, as discussed above in connection with the first element of the test for proving an oral modification, most, if not all, of plaintiff's testimony on this issue was directly contradicted by Swenerton and Mullins and plaintiff has failed to offer any credible evidence in opposition to Swenerton and Mullins' testimony. Simply put, plaintiff has failed to provide any evidence other than Palumbo's word, which was refuted by both Swenerton and Mullins, that the parties agreed to additionally compensate Bobrow Palumbo

Moreover, although plaintiff submits that he refused to perform the 2004 reset unless he was further compensated, such performance was already contractually required under the Agreement between the parties.[13] "The pre-existing duty rule states that promising to perform a duty that already is owed under an existing contract is not consideration, and thus, a modification to the contract is unenforceable." Contempo Design, Inc. v. Chicago Dist. Council of Carpenters, 226 F.3d 535, 550 (7th Cir. 2000) (citing 1 E. Allan Farnsworth, Farnsworth on Contracts, § 4.21, at 497 (2d ed. 1998)). Two exceptions to this rule are: (1) where the "promisee . . . undertake[s] to do something in addition to what he already is obliged to do under his preexisting duty" such that the additional consideration validates the modification; and (2) where the parties "agree to rescind the original contract, which allows them to create a different contract on entirely new terms, without providing additional consideration." Contempo Design, 226 F.3d at 550 (citations omitted). Plaintiff asserts that its claim for breach of contract is not

_____

[13] The Agreement explicitly states that as part of its "in-store service" duties, Bobrow Palumbo was required to "execute . . . resets in compliance with [the] schedule and standard established by Broan." (Ex. 2, Art. IV, § 4.3(b).) In addition, Section 4.4 of the Agreement mandates that Bobrow Palumbo "shall assume and pay all costs incurred in connection with in-store service," of which resets are explicitly included as per Section 4.3(b). (Id., § 4.4.)

precluded by the pre-existing duty rule because it agreed not to cancel the Agreement between the parties and perform the 2004 reset in exchange for the additional compensation it requested. (Pl. Post-Trial Mem. of Law, 14.) Plaintiff maintains that by relinquishing its right to cancel the Agreement, it provided additional consideration for the alleged oral modification.[14] (Id.)

Plaintiff's argument is without merit. The Agreement entered into by the parties in 1999 expressly provides that resets are a function for which Bobrow Palumbo was contractually responsible. (Ex. 2, Art. IV, § 4.3(b).) Compensation for such resets was determined by the Agreement. (Id., Art. VI.) The Agreement was not terminated by Broan until August 30, 2004, effective October 2, 2004. Accordingly, since Bobrow Palumbo was still contractually obligated to perform the 2004 reset at the time it performed it - April 2004 through July 2004 - the 2004 reset is a pre-existing duty and cannot be deemed consideration for the alleged modification that plaintiff purports to have taken place. Additional consideration is necessary.

As stated above, plaintiff asserts that its agreement not to cancel the contract between the parties furnished such additional consideration. However, the credible evidence submitted at trial does not establish that plaintiff chose to forego exercise of any right to cancel as consideration for added compensation. Plaintiff's arrangement with Broan was a profitable one and it placed plaintiff in an excellent position to gain even more business from Home Depot through the latter's implementation of the Roadrunner program. This was the reason that plaintiff chose not to exercise the right to terminate its contract with Broan. Having made the decision to go forward with the 2004 reset without any agreement for additional compensation,

---

[14] No argument is made, and no evidence has been offered to suggest, that the second exception to the pre-existing duty rule is applicable here.

plaintiff is bound by the terms of the Agreement with Broan, and therefore is not entitled to any additional recovery under the terms of the Agreement.

Based on the foregoing, I find that plaintiff has failed to demonstrate that an oral modification of the written Agreement between the parties occurred. I further find that plaintiff was contractually required to perform the 2004 reset pursuant to the Agreement between the parties, such that plaintiff's breach of contract claim is precluded by the pre-existing duty rule. Accordingly, recovery for plaintiff's breach of contract claim is hereby denied and judgment is granted in favor of defendant.

II.    Fraud and Misrepresentation

    A.    Legal Standard

Pursuant to Wisconsin law, plaintiff must demonstrate the following to establish a claim for fraudulent misrepresentation: "(1) a false representation, (2) made with the intent to defraud and for the purpose of inducing another to act upon it, and (3) actually inducing another to rely and act upon that representation, causing injury or damage." Green Spring Farms v. Kersten, 401 N.W.2d 816, 821 n.5 (Wis. 1987) (citations omitted); Lundin v. Shimanski, 368 N.W.2d 676, 680-81 (Wis. 1985) (citations omitted). Additionally, "'the defendant must either know the representation is untrue or the representation was made recklessly without caring whether it was true or false . . . .'" Lundin, 368 N.W.2d at 681 (quoting Whipp v. Iverson, 168 N.W.2d 201, 203 (Wis. 1969). "The party alleging the fraud has the burden of proving the elements by clear and convincing evidence." Lundin, 368 N.W.2d at 681 (citation omitted).

B.    <u>Plaintiff Failed to Prove that Defendant Fraudulently Induced Plaintiff into
Performing the 2004 Reset</u>

Plaintiff asserts that defendant fraudulently induced it into not canceling the

Agreement between the parties, and consequently performing the 2004 reset, by falsely

representing that it would provide plaintiff with additional compensation, knowing in fact that it

would not compensate plaintiff any further.  As proof of this claim, plaintiff offers Palumbo's

testimony that he informed Swenerton and Mullins at the April 2003 kitchen and bath show that

he would not perform the 2004 reset unless he was provided additional compensation.  Plaintiff

maintains that Swenerton and Mullins both advised Palumbo that they would consider the

request, provided there was financial justification for it, and that he should perform the 2004

reset because he would ultimately be compensated for it.  Plaintiff further maintains that after

submitting his third quote for the estimated cost of the 2004 reset in the amount of $258,000,

Swenerton advised him that the amount was "reasonable" and, in reliance on Swenerton's

statement, plaintiff performed the 2004 reset.  (Pl. Post-Trial Mem. of Law, 15-16.)

The evidence and the testimony offered by Broan during the bench trial plainly

contradicts plaintiff's version of events.  First, Mullins testified that although Palumbo expressed

concerns to her about the cost of the 2004 reset, he never stated that Bobrow Palumbo would

refuse to perform the reset.  (Tr. 188.)  I credit this testimony.  Second, both Swenerton and

Mullins testified that they informed Palumbo that they would consider his request for additional

compensation, provided he could supply financial justification to support it.  (Tr. 115-16, 128,

186, 197.)  I credit this testimony.  However, as both also testified, neither Swenerton or Mullins

ever communicated to Palumbo that Broan would indeed provide him with additional

compensation to perform the 2004 reset.  (Tr.110, 125, 129-31, 138-39, 187-88.)  I credit this

testimony as well.  Even Palumbo's testimony was insufficient to establish that any such representation was made by anyone from Broan in that Palumbo was unable to identify any particular representation that he would be compensated, but rather maintained that he was repeatedly instructed that the parties would "work something out."  (Tr. 16. 32.)  When asked on cross-examination whether he had anything in writing to substantiate his claim that Broan agreed to provide him with additional compensation to perform the 2004 reset, Palumbo confirmed that he did not and stated that the agreement was a result of the fact that "[n]obody rejected the quote" of $258,000 that he had provided.  (Tr. 67.)  This is not a predicate for a fraudulent inducement claim.

In addition, the letter by Palumbo to Tom Armstrong and Ed Martin of Home Depot on March 30, 2004, which was six days before the 2004 reset was set to commence, plainly states that "as of now, all three companies have no intention on paying us."  (Ex. 14.)  In his testimony, Palumbo confirmed that this was indeed a true statement at the time he wrote the letter, (Tr. 69), directly belying his contention that Broan had agreed to provide additional compensation for the 2004 reset as early as April 2003.  I do not credit plaintiff's argument in its Post-Trial Memorandum of Law that it was simply apprising Home Depot of a potential problem in the event that Broan refused to pay and plaintiff in turn refused to perform the 2004 reset.  (Pl. Post-Trial Mem. of Law, 16.)  Palumbo maintained throughout his testimony that Broan agreed to provide additional compensation starting in April 2003 when he allegedly spoke with Swenerton and Mullins at the kitchen and bath show.  (Tr. 17.)  Palumbo further testified that he was again assured by Swenerton and Mullins at the kitchen and bath show in March 2004 that he would be compensated.  (Tr. 39.)  However, following these alleged conversations, Palumbo stated in his

March 24, 2004 letter that Broan had no intention of compensating him any further for the 2004 reset, a statement Palumbo confirmed in his testimony. (Ex. 14; Tr. 69.)

Based on the foregoing, I find plaintiff's cause of action for fraudulent misrepresentation devoid of any merit. The testimony of Swenerton and Mullins, which I credit, established that there were no false representations made by Broan concerning additional compensation that plaintiff could have justifiably relied on. Moreover, plaintiff has failed to establish that Broan intended to defraud it or induce its reliance on any such statements. Rather, plaintiff was contractually obligated to perform the 2004 reset and was entitled to terminate the Agreement between the parties if it so chose. Plaintiff decided not to exercise this option to remain competitive for future work at Home Depot under the Roadrunner program. Although plaintiff ultimately chose to perform the 2004 reset, I find that it did so - not in reliance on any promises or representations by Broan - but due to the fact that it was attempting to maintain an amicable relationship with Home Depot in the hope that it would be chosen as the "go-forward rep" under the Roadrunner program. (Tr. 62-63.) As matters turned out, plaintiff failed to gain further business in Department 26 through the implementation of the Roadrunner program by Home Depot, but it was retained by Home Depot for other work under the program. Any "damages" plaintiff incurred as a result of its decision not to terminate and to continue the Agreement with Broan through the 2004 reset were due to its own choices, not any alleged fraud on the part of defendant.

Accordingly, recovery for plaintiff's claim for fraudulent misrepresentation is denied and judgment is granted in favor of defendant as to this cause of action.

III.    Defendant's Counterclaim for Attorney's Fees

A.    Legal Standard

Wisconsin law is clear that it follows the "American Rule," under which "parties to litigation are generally responsible for their own attorney's fees unless recovery is expressly allowed by either contract or statute, or when recovery results from third-party litigation." DeChant v. Monarch Life Ins. Co., 547 N.W.2d 592, 596 (Wis. 1996) (citation omitted); see also Hunzinger Const. Co. v. Granite Res. Corp., 538 N.W.2d 804, 809 (Wis. Ct. App. 1995) (citing Kremers-Urban Co. v. Am. Employers Ins. Co., 351 N.W.2d 156, 167-68 (Wis. 1984)). With respect to a contractual provision authorizing an award of attorney's fees, Wisconsin courts "will not construe an obligation to pay attorney's fees contrary to the American Rule unless the contract provision clearly and unambiguously so provides." Hunzinger, 538 N.W.2d at 809.

When applying the terms of a contract, Wisconsin courts attempt to "ascertain the true intention of the parties," Kraemer Bros., Inc. v. United States Fire Ins. Co., 278 N.W.2d 857, 860 (Wis. 1979), and interpret the contract according to the plain meaning of its terms, so long as it is unambiguous. Id. Under Wisconsin law, "a contract is ambiguous when its terms are reasonably or fairly susceptible of more than one construction." Borchardt v. Wilk, 456 N.W.2d 653, 656 (Wis. Ct. App. 1990) (citing Just v. Land Reclamation, Ltd., 445 N.W.2d 683, 686 (Wis. Ct. App. 1989)). Where the contractual language authorizing an award of attorney's fees is found to be ambiguous, Wisconsin courts will not enforce it. See, e.g., Hunzinger, 538 N.W.2d at 809 (finding contract ambiguous and declining to award attorney's fees because contract did not specifically mention them); Borchardt, 456 N.W.2d at 656-57 (declining to award attorney's fees on grounds that provision authorizing them in contract was ambiguous).

B.    Indemnification Provision in Agreement Between Bobrow Palumbo and Broan

Article IX, Section 9.5 of the Agreement between the parties, which is entitled "Indemnification," states as follows:

> Representative [Bobrow Palumbo] agrees to hold harmless
> and indemnify Broan and assume all liability, including but
> not limited to all actual attorney fees, actual costs, disbursements,
> damages, penalties and any other expense associated with
> actual or threatening litigation, arising directly or indirectly,
> either from Representative's breach of any obligation imposed
> or sought to be imposed by or pursuant to this Agreement.

(Ex. 2, Art. IX, § 9.5.)  Broan asserts that, due to judgment being granted in its favor, this provision of the Agreement requires plaintiff to reimburse Broan for the costs and attorney's fees incurred in defending this action.  (Def. Proposed Findings, 24, ¶ 35.)  Plaintiff, however, maintains that the use of the word "indemnify," as well as the clause "either from Representative's breach of any obligation imposed or sought to be imposed by or pursuant to this Agreement" render the provision ambiguous and therefore, pursuant to Wisconsin law, unenforceable.  (Pl. Post-Trial Mem. of Law, 20-21.)

With respect to plaintiff's first assertion, that the use of the word "indemnify" imports ambiguity into the provision, plaintiff cites to a decision of the Wisconsin Court of Appeals, Business Park Dev. Co. v. Molecular Biology Res., Inc., 686 N.W.2d 456 (Wis. Ct. App. 2004), in which the intermediate appellate court held that the term "indemnify," as used in the contract between the parties, had more than one reasonable interpretation and, therefore, the provision authorizing attorney's fees was ambiguous and should not be enforced.  While it does not appear that this opinion has been reversed or modified in any way, it is an unpublished opinion of an intermediate appellate court and, pursuant to Rule 809.23 of Wisconsin's Rules of Appellate Procedure, "is of no precedential value and for this reason may not be cited in any court of

[Wisconsin] as precedent or authority except to support a claim of res judicata, collateral estoppel or law of the case.<sup>15</sup>" <u>Id.</u> at 456. Accordingly, since the Court is applying Wisconsin law to the within action, pursuant to the Agreement between the parties, it follows that it may only apply law that would be applied by a Wisconsin court. Therefore, although the court in <u>Business Park Development</u> found that the word "indemnify" rendered the attorney's fees clause ambiguous, that case has no precedential value under Wisconsin law.[16]

Merriam-Webster's Dictionary provides two meanings for the word "indemnify": (1) "to secure against hurt, loss or damage," and (2) "to make compensation to for incurred hurt, loss or damage." Merriam-Webster Dictionary, <u>available at</u> http://www.merriam-webster.com/dictionary/indemnify. Similarly, Black's Law Dictionary defines "indemnify" as follows: (1) "[t]o reimburse (another) for a loss suffered because of a third party's <u>or one's own</u> act or default;" (2) "[t]o promise to reimburse (another) for such a loss;" and, (3) "[t]o give (another) security against such a loss." Black's Law Dictionary (8th ed. 2004) (emphasis added). Under Wisconsin law, contract terms are to be afforded their "plain and ordinary meaning." <u>Kennedy v. Nat'l Juvenile Det. Ass'n</u>, 187 F.3d 690, 694 (7th Cir. 1999) (citing <u>Meyer v. City of Amery</u>, 518 N.W.2d 296, 298 (Wis. App. 1994)); <u>North Gate Corp. v. Nat'l Food Stores, Inc.</u>, 140 N.W.2d 744, 746 (Wis. 1966) ("Words used in a contract are generally given their plain or ordinary meaning . . . ."). "Dictionary definitions are dispositive of the ordinary meanings

---

[15] It should be noted that a Shepard's analysis of the case demonstrates that the opinion is not cited by any other existing case, whether in Wisconsin or elsewhere.

[16] Moreover, the Court was unable to find any other cases rendered by any of the Wisconsin state or federal courts with holdings similar to that of the <u>Business Park Development</u> case.

ascribed to contract terms." <u>Tweet/Garot-August Winter, LLC v. Liberty Mut. Fire Ins. Co.</u>, No. 06-C-800, 2007 U.S. Dist. LEXIS 9262, at *10 (E.D. Wis. Feb. 7, 2007) (citing <u>Gorton v. Hostak, Henzl & Bichler, S.C.</u>, 577 N.W.2d 617, 623 (Wis. 1998)).  Moreover, "[t]he fact that a term is general enough to encompass more than one interpretation does not necessarily make that term ambiguous." <u>Kennedy</u>, 187 F.3d at 694 (citing <u>Amcast Indus. Corp. v. Affiliated FM Ins. Co.</u>, 584 N.W.2d 218, 226 (Wis. App. 1998)) (additional citation omitted).  Accordingly, based on both Webster's and Black's definitions, the Court finds that the plain and ordinary meaning of "indemnify" is to make payment to another for damage incurred, whether by the fault of the paying party or a third party.

Moreover, the word "indemnify" is preceded by the term "hold harmless," which, as defined in Black's Law Dictionary means "[t]o absolve (another party) from any responsibility for damage or other liability arising from the transaction."  Black's Law Dictionary (8th ed. 2004).  Under the traditional canon of both statutory and contract construction, <u>noscitur a sociis</u>, "'a word is known by the company it keeps.'" <u>SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props., LLC</u>, 445 F. Supp. 2d 320, 354 (S.D.N.Y. 2006) (quoting <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561, 575 (1995)); <u>see also</u> <u>Dole v. United Steelworkers of Am.</u>, 494 U.S. 26, 36 (1990) ("The traditional canon of construction, noscitur a sociis, dictates that words grouped in a list should be given related meaning.") (internal quotation marks omitted).  According to this principle, "the meaning of an unclear word or phrase should be determined by the words immediately surrounding it."  Black's Law Dictionary (8th ed. 2004).  In addition, Wisconsin law instructs that "[t]he meaning of particular parts or words in a contract should be determined in light of and consistent with the general purpose of the agreement." <u>Carey v. Rathman</u>, 200

N.W.2d 591, 594 (Wis. 1972) (citation omitted).

Applying the foregoing principles, the Court finds that the use of the term "indemnify" in the Agreement at issue is not ambiguous. By its terms, it mandates reimbursement to Broan in the event that Broan is subject to any liability arising from threatened or actual litigation as a result of Bobrow Palumbo's breach of any obligation arising from the Agreement. Even assuming arguendo that the definition of "indemnify" is somehow in doubt, when taken together with the phrase "hold harmless," it is clear to the Court that the provision is intended to absolve Broan from any liability for expenses incurred in connection with threatened or actual litigation arising from the Agreement. In addition, unlike Hunzinger, 538 N.W.2d at 809, where the Wisconsin Court of Appeals declined to enforce an attorney's fees clause on the grounds that it was ambiguous because it did not specifically provide for attorney's fees, the provision here explicitly states that the costs for which Broan is entitled to seek reimbursement include "actual attorney's fees." (Ex. 2, Art. IX, § 9.5.)

Plaintiff's second argument, that the phrase "either from Representative's breach of any obligation imposed or sought to be imposed by or pursuant to this Agreement" is ambiguous, and therefore renders the indemnification provision unenforceable, fails as well. Pursuant to Section 4.3 of the Agreement, as part of its in-store service function, Bobrow Palumbo was obligated "to execute display sets and resets in compliance with [the] schedule and standard established by Broan." (Id., Art. IV, § 4.3(b).) Such services were assumed by Bobrow Palumbo at its own costs, pursuant to Section 4.4 of the Agreement, which provides that "Representative shall assume and pay all costs incurred in connection with in-store service . . . ." (Id., Art. IV, § 4.4.) The overall compensation for such services, to which Palumbo agreed, was "3% of Net Sales,"

as defined in Exhibit B to the Agreement. (<u>Id.</u>, at Ex. B.) By commencing the within litigation and seeking to obtain compensation in excess of the three percent (3%) of net sales for performing the 2004 reset, to which it was contractually bound, Bobrow Palumbo has "directly or indirectly" breached its obligation under the Agreement to assume all costs associated with the reset, which, as explicitly stated in the indemnification provision, entitles Broan to reimbursement for the attorney's fees and costs associated with defending the action.

Based on the foregoing, the defendant's counterclaim for attorney's fees and costs is hereby granted solely as to liability, with the actual amount of recovery to be awarded at a later date due to the fact that defendant's submission does not include the total amount of attorney's fees and costs incurred in connection with this action. Defendant is granted thirty (30) days from the date of this decision to supplement its submission and plaintiff is afforded thirty (30) days thereafter to file any opposition, solely with respect to the amount of attorney's fees sought by defendant and not as to liability.

CONCLUSION

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiff's complaint asserting claims for breach of contract and fraud and misrepresentation is dismissed.

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that defendant's counterclaim for indemnification is granted, with the amount of attorney's fees and costs to be determined at a later date.

**SO ORDERED:**

Dated: Central Islip, New York
       January 4, 2007

                                        /s/ E. Thomas Boyle
                                        HON. E. THOMAS BOYLE
                                        United States Magistrate Judge